Joe and Esther BEGAY, Louise Jane Begay, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 268–85L, 335–85L.

United States Claims Court.

Aug. 7, 1987.

Lee Brooke Phillips, Flagstaff, Ariz., counsel for plaintiffs. Richard Hughes and Luebben, Hughes and Tomita, Albuquerque, N.M., of counsel.

Edward J. Passarelli, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, attorney of record for defendant. Susan Crystal, Navajo Hopi Indian Relocation Com'n, of counsel.

OPINION

LYDON, Judge:

■ In these two consolidated cases, plaintiffs, members of the Navajo Tribe of Indians, seek to recover damages growing out of their relocation from their home sites in 1979, pursuant to the Navajo–Hopi Land Settlement Act, Pub.L. No. 93–531, codified, as amended, at 25 U.S.C. § 640d *et seq.* (1982) (the Act or the Relocation Act). The damages plaintiffs seek are based on the social, cultural, economic and psychological harms they allegedly suffered as a result of their relocation. Defendant has filed a Motion to Dismiss the consolidated complaints, or in the alternative a Motion for Summary Judgment. Plaintiffs have responded by opposing defendant's motions and, in turn, have filed a Cross–Motion for Summary Judgment.[1] Upon consideration of the briefs of the parties, and after oral argument, the court concludes that defendant's motions should be granted.

I.

*Introduction*

The statutory framework underlying both of these actions is the Act, *supra.* In an attempt to end a conflict concerning ownership of certain land between the Navajo and Hopi Indians, that was almost 100 years old, the Act was passed in 1974. The following language, from the case of *Walker v. Navajo–Hopi Indian Relocation*

---

1. Plaintiffs request, if their Motion for Summary Judgment is not granted, that the court "withhold judgment on [defendant's Motion for Summary Judgment] pursuant to RUSCC 56(g) pending Defendant's response to Plaintiffs' outstanding discovery request * * * [and their] responsive briefing * * *." Pursuant to RUSCC 56(g) a party that opposes a motion for summary judgment may set forth in an affidavit the reasons why the party cannot present by affidavit facts which are essential to justify opposition to the motion. The court may then refuse to grant summary judgment or order a continuance to allow affidavits to be obtained or other discovery to be had. RUSCC 56(g). The court does not look favorably on plaintiffs' request because plaintiffs have failed to meet the initial threshold requirement of submitting affidavits which state the reasons why facts essential to the opposition to defendant's Motion for Summary Judgment cannot be presented by affidavit.

*Commission,* 728 F.2d 1276, 1277 (9th Cir. 1984), *cert. denied,* 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984), provides a succinct background statement of the facts leading up to the passage of the Act:

> In 1882 a large reservation in northeastern Arizona was set aside for use by the Hopi Indians and "such other Indians as the Secretary of the Interior may see fit to settle thereon." Executive Order of December 16, 1882. In subsequent years, members of the nearby Navajo Tribe migrated to much of the Reservation and settled. By the middle part of this century the Reservation was populated largely by Navajos. The Hopi and Navajo tribes, which historically had competed for resources, became enmeshed in a struggle over the reservation lands.
>
> Various legislative and administrative efforts were made to quell the land conflict. *See generally Healing v. Jones,* 210 F.Supp. 125 (D.Ariz 1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) (per curiam). In 1962 it was determined that most of the reservation was held jointly and equally by Hopi and Navajo tribes. *Id.* The *Healing* case did little to resolve the conflict between the two tribes over the Joint Use Area ("JUA").

The *Healing* case, mentioned in the above passage, did indicate that it felt both parties each had a one-half interest in the JUA but that the court itself was without jurisdiction to actually partition the JUA. *Id.* at 191–92. The *Healing* court, however, remained available to the parties relative to negotiation and settlement efforts.

In 1974, Congress passed the Act to facilitate the partitioning of the land making up the JUA. Pursuant to 25 U.S.C. § 640d, a mediator was appointed to assist in a settlement and partition of the relative rights of the Hopis and Navajos. Congress, in the Act, conferred jurisdiction on the District Court of Arizona in this effort. Each tribe was to appoint a negotiating team to work with the mediator to arrive at a settlement. 25 U.S.C. § 640d–1. If either a full or partial agreement was reached by the two tribes it would ultimately be submitted to the Arizona District Court for inclusion in the record as supplemental proceedings in the *Healing* case. 25 U.S.C. § 640d–2. If the tribes could not reach an agreement, or a negotiating team did not abide by the requirements of § 640d–1, the mediator could submit his own report. 25 U.S.C. § 640d–3. The District Court could review the (non-binding) report and conduct further proceedings prior to making a final adjudication, including partition of the JUA. *Id.* Thus, under either provision, the court was now empowered to partition the land, thereby completing the job it started in *Healing v. Jones, supra.*

Within two years after the issuance of an order by the District Court, pursuant to either § 640d–2 or § 640d–3, the Navajo and Hopi Indian Relocation Commission (NHIRC or Commission), which was established by the Act, was to prepare and submit a report to Congress concerning the relocation of those Indian households (their members and personal property) who were occupying land partitioned to the other tribe. 25 U.S.C. § 640d–12(a). The report was to contain the names of those Indians who lived in the areas partitioned to the other tribe. 25 U.S.C. § 640d–12(b)(1). It was also to contain the fair market value of the habitations and improvements owned by the heads of households identified in subsection 12(b)(1). 25 U.S.C. § 640d–12(b)(2).

The report was also to include a "detailed plan for relocation." 25 U.S.C. § 640d–12(c). This plan was to: (1) be developed with a maximum input of relocatees and representatives of tribal councils; (2) take into account adverse social, economic, cultural and other impacts of relocation on the relocatees and avoid or minimize the impact as much as possible; (3) identify the relocation sites, including the distances involved; (4) assure that housing and related community facilities and services such as water, sewer, roads, schools and health facilities were available at the relocation site; and (5) provide for the time period in which the plan was to take ef-

fect.[2] Additionally, the Commission was empowered to proceed with relocations as "promptly as practical" after its first meeting (and prior to enactment of its plan). 25 U.S.C. § 640d–12(c)(5).

The Act also provided for various payments to be made to the heads of households that were relocated. They were to be paid the fair market value of the habitation and other improvements owned in the area from which they were required to move. 25 U.S.C. § 640d–14(a). They were also to be paid the actual reasonable moving expenses, as if the household members were displaced persons under section 202 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. 25 U.S.C. § 640d–14(b)(1). Additionally, each head of household was entitled to an amount which when added to the amount paid pursuant to § 640d–14(a) was equal to the cost of a "decent, safe and sanitary" replacement dwelling to accommodate the household. 25 U.S.C. § 640d–14(b)(2).[3] The payments received under § 640d–14(b)(2) could only be used to obtain decent, safe and sanitary replacement dwellings for relocated households. *Id.* Finally, the Act also provided for "bonus" payments to families who contracted to relocate within certain time periods after the effective date of the relocation plan. 25 U.S.C. § 640d–13(b). For example, a head of household who contracted to relocate prior to the expiration of one year after the effective date of the relocation plan would be paid $5,000. 25 U.S.C. § 640d–13(b)(1).[4]

The Commission held its first meeting in 1976. Subsequent to that meeting it began to solicit applications for voluntary relocations. *See* 25 U.S.C. § 640d–12(c)(5). The final partition line was established by order of the Arizona District Court in an apparently unpublished opinion which was affirmed by the Ninth Circuit Court of Appeals in *Sekaquaptewa v. MacDonald,* 626 F.2d 113 (9th Cir.1980). *See also Sidney v. Zah,* 718 F.2d 1453, 1455 (9th Cir.1983). Consistent with the requirements of 640d–12(a), the Commission prepared a report and plan and submitted them to Congress.

II.

A. *Facts and Claims (Docket No. 268–85L)*

The plaintiffs in docket No. 268–85L are Esther Begay (hereinafter Esther) and Joe Begay (hereinafter Joe). Esther and Joe are married. Esther in 1978 was 28 years of age; Joe in 1978 was 34 years old and worked for the Sante Fe Railroad. Esther was deemed "head of household" as that phrase was used in the Act. Esther and Joe are both enrolled members of the Navajo tribe. Prior to the events giving rise to this action they resided with their family (two children), on the Hopi side of the JUA. They did not own a home at that time. It is claimed that Esther and Joe have had little formal education and can not read or write English. Esther says she can speak some English. Both apparently are able to write their names in English.

In 1977, Esther and Joe agreed to an "early" relocation, i.e., before finalization of a relocation plan. *See* 25 U.S.C. § 640d–12(c)(5). There are indications in the materials at hand that conditions on the

---

**2.** As originally drafted the plan was to take effect thirty days after its submission to Congress. However, in 1980 this time period was changed to ninety days.

**3.** The maximum payment established by the statute for a family of four or more was $25,-000. However, this figure could be adjusted by the Navajo and Hopi Indian Relocation Commission (NHIRC or the Commission) after consultation with the Secretary of Housing and Urban Development. At time periods relevant to the instant cases, the limit for a family of four or more was $39,000. The Navajo plaintiffs in both cases resided at the time the Act was passed on the JUA on the Hopi partitioned

land. The plaintiffs in both cases represent families of four or more.

**4.** Plaintiffs in both cases received maximum bonus payments of $5,000. Plaintiffs contracted to relocate prior to a relocation plan even being formulated. Although it is not clear from the submissions of either side, apparently those who contracted to relocate before implementation of a plan were also entitled to the maximum bonus payment. In any event, it is undisputed that plaintiffs received payments of $5,000 and defendant does not assert that payment of a bonus to plaintiffs was in any way incorrect.

JUA at this time were "outrageous." Navajo Indians on the wrong side of the JUA were harassed by members of the Hopi Tribe and the reverse was also true. The relocatees literally had no place else to go and were forced by said conditions to move off the JUA. Esther and Joe wanted to "stay" on the Navajo Reservation, as opposed to living off the Reservation in town. In 1977, Esther applied for a homesite lease on the Reservation. In her application for relocation benefits Esther indicated that she wanted a "stone-type-house."

According to defendant, certification for eligibility for relocation benefits was suspended during 1978. However, certification was resumed in 1979. By letter dated March 28, 1979, Esther was informed that her family had been certified for benefits. This letter ended with the following sentence (in capital letters): "PLEASE *DO NOT SIGN* ANY PURCHASE AGREEMENT OF ANY KIND UNTIL AFTER YOUR APPOINTMENT WITH REAL ESTATE SERVICES" (emphasis original). The standard procedure of the Commission was to refer its clients (relocatees) to the real estate section to inform them about their options. Defendant asserts that Navajo interpreters were provided upon request to those who needed them. On page 2 of the "Realty Interview Checklist", apparently used by Commission employees in their real estate counseling sessions, was the following entry (in capital letters): "SPECIAL NOTE: DO NOT *SIGN* ANY CONTRACTS WITHOUT OUR APPROVAL" (emphasis original). This message is repeated on the bottom of page 4. Esther and Joe had their interview with the realty section on April 4, 1979. They both signed the checklist, certifying that all of the items contained within it had been explained to them.

Esther and Joe's real estate counselor was Harry "Bob" Sharp (Sharp). In Esther's affidavit, she describes her dealings with Sharp as follows: she informed Sharp that she and Joe wished to build a stone house that would be heated by wood and the Navajo Tribe had agreed to supply the necessary labor; Sharp rejected the cinderblock home proposal because it would take too long to build; Esther and Joe were told they had only three months to relocate; instead, Sharp informed Esther and Joe they had to choose a mobile or modular home from one of two companies located in Flagstaff, Arizona—Village Homes or Leisure Homes, Inc.; Sharp sent Esther and Joe to Village Homes to look at the modular homes; Esther did not like the mobile homes and felt they were too expensive in relation to their benefits; Esther and Joe returned to see Sharp and he then took them to Leisure Homes; they did not like the mobile homes they saw there (referred to sometimes as "trailers" in the exhibits) but were attracted to the 25–inch color TV that came with the mobile homes.

According to plaintiffs, Esther went to the Commission again and Sharp told her to return to Leisure Homes. She requested that Sharp accompany plaintiffs, but he refused because he had too much paperwork to do. Upon arriving at Leisure Homes, a salesman showed Esther and Joe the trailer that had been selected for them. Esther and Joe told Sharp about the trailer and a foundation, which the salesman said would be provided for the home and would last forever. Sharp told Esther that the Commission could build such a foundation. A few weeks later Esther received a letter from Leisure Homes saying the trailer they looked at was going to be sold. Esther informed Sharp of this fact and he instructed her to go purchase the trailer. According to plaintiffs, no one told Esther and Joe not to sign the purchase agreement.

About a month after Esther and Joe "chose" the trailer, Sharp told them to come in and sign the relocation contract. According to Esther and Joe, nobody explained the contract to them or translated it for them. They were simply instructed to sign it.

Defendant's version of the facts surrounding the purchase of the mobile home is very different from Esther and Joe's version set out above. Defendant claims that despite the warnings about signing purchase agreements contained in the above-referenced documents, Esther and Joe executed a purchase agreement with

Leisure Homes on the same day as their interview with the Commission. Defendant's Appendix to its brief contains a "Salesman's Worksheet" dated April 4, 1979, the date of the interview with Esther and Joe. The worksheet was not signed by Esther or Joe. However, plaintiffs' brief does state that Esther and Joe purchased their mobile home on or about April 4, 1979. Thus defendant's version of the facts is that Esther and Joe attended one meeting with a Commission real estate counselor and then later on the same day that they had their initial interview with the Commission real estate counselor they purchased their mobile home from Leisure Homes. This purchase, defendant claims, was without any approval of the Commission and in direct contradiction to the Commission's direct and specific warning not to make any purchase without Commission approval. On the other hand, Esther's version of the facts, contained in her deposition, suggests a much more complicated scenario, involving several meetings with the Commission and a long time period between the first meeting and the purchase of the mobile home. According to Esther's version, there appears to have been at least four meetings with Sharp. Additionally, under Esther's version of the facts a period of a "few weeks" passed between the time Esther and Joe *returned* to Leisure Homes and Sharp instructed them to purchase the trailer. (These were ostensibly Esther and Joe's third and fourth meetings with Sharp). This *conflict in the facts cannot be resolved on this record.*

On May 8, 1979 Esther and Joe executed a "Contract for Relocation." This contract stated: "the Relocatees *will* negotiate a purchase agreement with Leisure Homes, Inc. of Flagstaff, Arizona for the purchase of a new 60Y24 Redmad [sic]—Flamingo

Mobile Home." Contract § 6 (emphasis added).[5] The purchase price was not to exceed $39,000. *Id.* Section 6b stated that "any portion of the replacement home benefits in excess of the purchase price shall be used to construct a solid foundation for the mobile home." The price of the mobile home was $37,030.00. Contract § 6(d)(1).[6] Esther and Joe were to open an escrow account to consummate the purchase of the home. *Id.* The account was made up of $37,030.00, the purchase price. *Id.* The money was to be deposited in the escrow account by the Commission on or before delivery of the mobile home. *Id.* The balance in the account was to be released to Leisure Homes when the house was delivered to the homesite and passed inspection. Contract § 6(d)(2)(a).

On April 20, 1979 the real estate section requested the technical services branch to conduct an evaluation of Esther and Joe's proposed homesite location. The evaluation was completed and the homesite was rated "satisfactory." The report indicated that power was available, there was a school within two miles, and a clinic within nine miles. The report stated that a water system was needed in the area.

An inspection was also made of Esther and Joe's mobile home. It was found to conform to the "decent, safe and sanitary" requirements. The inspection report was dated May 8, 1979. It is impossible to read the signature of the individual who performed the inspection. The materials before the court indicate that the individual who performed the inspection was Ted Namingha (Namingha), who is no longer employed by the Commission. Esther and Joe claim that Namingha "inspected" the trailer by remaining in his truck and simply asking some questions. They state the inspection was done about a week after the

---

**5.** The purchase agreement had already been "negotiated" and executed by Leisure Homes and Esther and Joe Begay (hereinafter Esther and/or Joe). There seems to be agreement that the purchase had been made about a month before the relocation contract was signed.

**6.** No foundation was constructed for the mobile home. After subtracting the purchase price of $37,030 from the replacement benefits of $39,-

000 the remaining balance was $1,970. From this figure $1,150.47 was expended to set up electrical service for Esther and Joe. Then, $549.20 was expended, ostensibly for the purchase of a propane tank although there is no documentation to support this fact. The final balance, $270.33, was expended on propane gas. Accordingly, there was no money available from the $39,000 to construct a foundation.

trailer had been delivered. It is noted that the inspection report was dated the same day as the relocation contract.

Despite the reports detailed above, Esther and Joe assert in their complaint that neither their home nor the land was ever inspected before, during or immediately after installation of the mobile home. Esther and Joe also complain that a foundation was never provided, and the mobile home was only set on cinderblocks without skirting or solid anchoring. Because of high winds in the area, Esther and Joe claim, the mobile home joints separated and there was other damage to said home. Esther and Joe also claim there were many other defects with the trailer: no proper steps; wiring was left exposed; gas line was improperly installed; heater was defective and failed to work properly; water system was improperly installed and never functioned properly which led to frozen and cracked pipes; trailer could not be properly heated because of cracks and holes and inadequate insulation; and "numerous other defects." They claim the house was never decent, safe and sanitary and was unsuitable for use as a dwelling place.

On October 14, 1980 Esther filed a request for a hearing with the Commission. The following reasons for the request were listed: no inspection of the mobile home during construction, or after move in; home never completed, e.g., no skirting; relocation procedures not fully explained; $39,000 not enough to cover housing costs; wanted backup heat to the central butane system; electric motor on water heater did not work; dishwasher did not work and electrical sources and power supply insufficient for the appliances; broken window. Esther requested that the Commission conduct a complete inspection of the mobile home.

At the hearing Esther reiterated her position that she and Joe had always wanted a cinderblock home. She also restated many of the above claims in her request for a hearing. Commissioner Massetto, the hearing officer, ordered that an inspection be made of Esther and Joe's mobile home. The inspection was made on January 16, 1981. The inspection report stated that the home did not meet the decent, safe and sanitary standards. Additionally, the report stated that the home had not met these standards as of the date of purchase (April 4, 1979). The report estimated that it would take $4,500 to repair all defects.

Defendant asserts that from January 1981, until February 1982 the Commission did not have any money available for home repairs. On December 6, 1982 the Commission did make an offer to Esther and Joe to repair their home. Meanwhile, in 1982, Esther had become pregnant. Esther and Joe's complaint states that Esther informed defendant of her pregnancy and her need to live in a warm building. On September 8, 1982 Esther gave birth to a baby girl (Reba). The baby, plaintiffs allege, reportedly had pneumonia. According to Esther's affidavit, the family was forced to retreat to a hogan (a small hut—the traditional residence of the Navajo) they had constructed on the property because they could not keep the mobile home sufficiently warm for the baby. Later they installed a woodstove in the trailer and moved back. Reba died of pneumonia on December 24, 1982, some three months after birth.

In 1983, Esther and Joe moved out of their relocation mobile home to public housing in Winslow, Arizona. On January 10, 1983, a conference was held between Esther and Joe and the Commission concerning settlement of Esther and Joe's housing appeal of October 1980. Esther and Joe were represented by counsel. It was recommended by the Commission representative Thomas McGee that there be a hearing on the appeal settlement. In March of 1983 the Navajo Tribe cancelled its contract with the law firm that had represented Esther and Joe. As a result, no negotiations relative to housing repair for relocatees were undertaken until September 1983 because of the absence of attorneys to represent the relocatees. With the execution of a Tribal contract with new attorneys, negotiations between the Commission and the relocatees relative to housing complaints began again. Beginning in October 1983 and through May of 1985 the Commission made offers to Esther and Joe to repair

their home. The estimated cost of repairs was $5,000. In July of 1984, Esther and Joe, through their attorney, rejected defendant's offer and stated it would make a counter offer. As of December 1984 there was no counter offer. However, on December 6, 1984, Esther and Joe did file an administrative claim for $590,000 pursuant to the Tort Claims Act, 28 U.S.C. § 2672 (1982). This claim was denied on June 6, 1985.

On January 14, 1986 an administrative resolution of Esther and Joe's housing benefits claim was reached by the parties. The "Stipulation and Agreement" was entered into by Esther and Joe and the Commission. It stated that an appeal had been filed on October 14, 1980; an inspection of the home was made on October 11, 1983; and an agreement was reached on October 24, 1985. A translator was present. Under the agreement Esther and Joe's mobile home was to be sold and the proceeds would be utilized toward a replacement dwelling meeting the Commission standards. Esther and Joe were to abide by the current housing acquisition regulations and procedures. The Commission would add money to restore the family to "high benefits" in effect at the time of the subsequent home replacement. As of March 1985, the maximum replacement home benefit for a family of four or more had grown to $66,000. Under the terms of the settlement, there would be no further entitlement to appraisal or bonus payments. The provision of high benefits was intended to resolve all claims for relocation and replacement benefits under § 640d–14 and the regulations. Esther and Joe were to withdraw their appeal concerning the quality of their original replacement home after work on the new replacement home was completed. They could, however, initiate an appeal concerning the new replacement home if it did not meet the decent, safe and sanitary requirements. The order dismissing the original appeal was a full, final and complete settlement. The settlement was limited to the replacement of the original

relocation dwelling and resolved all claims pertaining to that. It did not apply to other claims of consequential damages resulting from any housing defects. It was agreed that Esther and Joe could not use the stipulation as evidence in an action for consequential damages. It was also agreed that the Commission could use the agreement as evidence in an action by Esther and Joe for direct benefits.

In this litigation, Esther and Joe's complaint seeks one million dollars in damages. The claims are set forth in three counts. Presumably, these counts present alternative claims, each count setting forth a different theory or basis for recovery. These counts are more fully discussed, *infra*. Simply stated, the complaint seeks recovery of damages based on: (1) breach of statutory duty (Count I); (2) breach of trust (Count II); and (3) breach of contract (Count III). The damages prayed for are labeled "direct and consequential" in the first count (statutory duty) and "compensatory, consequential and incidental" in the other two counts. The harms for which Esther and Joe seek recovery are: (1) their home was so defective that it never qualified as "decent, safe and sanitary," as required by the Act;[7] (2) the Commission failed to provide counseling and other needed services during their relocation and assistance after relocation; (3) the death of their baby girl Reba and (4) "social, economic, psychological and cultural" harm caused by the breach of trust.

### B. *Facts and Claims (Docket No. 335–85L)*

The plaintiff in docket No. 335–85L is Louise Jane Begay (hereinafter Louise). Louise is an enrolled Navajo. Prior to the events giving rise to this action, Louise resided with her eight children on the Navajo Reservation on the Hopi side of the JUA. She lived in a rented house. She had lived the vast majority of her life on the Reservation. Louise claims she has a limited formal education and is not used to

---

7. However, see discussion above concerning the Stipulation entered into between Esther and Joe which settled all claims Joe and Esther had

relative to defendant's failure to provide decent, safe and sanitary housing relative to the mobile home purchased in 1979.

the Anglo-urban lifestyle. In 1977, Louise applied for benefits provided by the Act. She was certified for benefits in 1979.[8]

In her complaint, Louise claims that she wanted to have her relocation home built on the Navajo Reservation but she was discouraged from doing so by the Commission. In her affidavit, Louise avers that Sharp (the same counselor mentioned previously) told her it would take too long for her to secure a homesite on the Reservation. The materials at hand suggest that obtaining a homesite lease on the Reservation during this period was not easy and sometimes required a long waiting period before a homesite lease became available. By the time, he told her, she received a lease and built a home her benefits would expire. Louise's complaint alleges further that the Commission recommended that she purchase a prefabricated home from Village Homes. The Commission represented, she claims, it would be decent, safe and sanitary. Village Homes, it is represented, was a Utah corporation that did a considerable amount of business with relocatees.

Defendant denies that the Commission ever discouraged Louise from staying on the Reservation. It claims that Louise wanted to purchase the house she was renting but could not do so because it was located on the Hopi side of the JUA. She had to move from the Hopi area in any event. When Louise found out she could not buy the house she was renting, she indicated to the Commission that she wanted to move to Flagstaff. Defendant supports the Commission's version, *supra*, with an internal Commission memorandum that contains three different entries, dated June 27, 1977; July 1, 1977; and August 16, 1977, indicating that Louise wanted to move to Flagstaff.

According to Louise's affidavit, Sharp showed her some Village Homes near Page, Arizona, and some homes that were on the Navajo Reservation. She felt these homes were too expensive for her benefits. However, Sharp told her he could "work

something out." Louise began to think about modular homes near Leupp, Arizona, which was on the Reservation. At a later date, Sharp personally transported Louise to Village Homes. He told her she would get a good deal at that point but she must decide soon because her benefits would soon expire. Louise picked a modular home that would "just fit" within her benefits.

Louise's complaint states that she reluctantly purchased her modular home from Village Homes. She says that she relied both on verbal and pictorial representations made by the Commission that the home would be decent, safe and sanitary and on the Commission's misrepresentations that her eligibility for benefits would expire if she did not act quickly. In her affidavit, Louise states she never received any help in picking her relocation house.

On June 7, 1979 Louise entered into a relocation contract with the Commission. The contract stated that Louise agreed to relocate to the Cosnino Equestrian Subdivision in Coconino County. This site was off the Reservation. The contract stated that Louise was entitled to the following benefits: $5,000 as a relocation bonus; $4,733.17 for appraisal funds; $39,000 for relocation funds; and $500 for moving expenses, (total: $49,233.17). According to the contract, Louise allowed the Commission to combine all of her benefits (total: $49,233.17) with which she would purchase the home.

Louise and Village Homes were instructed by the contract to negotiate a construction contract and open an escrow account. The total purchase price ($49,233.17) was to be placed in the account. The first draw on the account was to be $15,500.00 to cover the cost of the real property and earnest money. A schedule for the release of the remaining funds was set up, with four more draws to be paid as construction progressed on the home, as follows: (a) $5,100 when the foundation was poured, (b) $11,-950 when construction framing was com-

---

8. In her complaint, Louise claims she was certified for benefits on May 30, 1979. Defendant answered by saying certification was on April 19, 1979. This dispute over the actual date is not deemed material.

pleted at the plant, (c) $11,950 when the home was delivered and set on foundation at homesite and (d) $4,733.17 when the home passed final inspection.

On June 28, 1979 Louise executed a purchase agreement with Village Homes. This agreement included the purchase of both the mobile home and the lot. The purchase agreement specifically stated that a refrigerator was not included in the purchase price. It was silent as to furniture.

The home was constructed on the site in August and September of 1979. It was inspected by the Commission on September 27, 1979. A document entitled "memorandum", which labeled the inspection a "final inspection", listed 26 "disappointments." These "disappointments" were due to defective and improper construction and installation activities. A follow-up inspection was conducted on October 12, 1979 at which time it was found only two defects remained. The memorandum written after the second inspection requested that the final draw be paid to Village Homes and the escrow account be closed. On November 6, 1979, a final inspection was done and no defects were reported in a memorandum relative thereto.

Louise claims that it was only after she was informed by Village Homes that her home was ready for occupancy that she realized that it was not located on the Reservation. Additionally, in her affidavit she asserts that she was "informed" that her $5,000 bonus was applied to the purchase price of the home. She had planned to use that money to purchase a vehicle and furniture for her new home.

Louise claims that the Commission paid the full purchase price of the modular home without determining if it had been properly installed or if it would provide a decent, safe and sanitary home. Additionally, she claims, there was never an inspection of the site prior to delivery of the home. Defendant has not offered any persuasive evidence to support its assertion that a preinstallation inspection of the site was done. Within months after installation of the home, Louise claims, defects in construction and assembly began to create

problems. The home settled; the foundation and walls cracked; and wall tiles fell off. The home separated in half causing the loss of electricity to over half of it. Louise claims she made complaints to both Village Homes and the Commission, but to no avail. Louise alleges she was simply informed that she was responsible for her own home and the Commission was not responsible for her once she relocated.

Defendant states that during 1980, the Commission made several attempts to contact Louise to provide post move assistance. Once relocated, a client was referred to the Commission's social services branch for follow-up consultations. The record contains a letter that the Commission sent Louise instructing her to set up a post relocation interview. It also contains two internal Commission memoranda reporting that attempts had been made to contact Louise. The documents do not describe what kind of assistance would be provided to Louise. The Commission stated it had no authority to provide financial assistance to Louise beyond the relocation benefits. However, through Native Americans for Community Action (NACA), the Commission was able to assist Louise in getting federal and state aid.

Like Esther and Joe, Louise filed a housing appeal on October 14, 1980. In her appeal she complained that: one side of the home had no electricity; the front and back doors in the living room did not work; a piece of the heater had "burned off"; the screens were falling out; there were mice in the house; cold air came in through the electric outlets and windows; the baseboard in the kitchen was missing; and the kitchen wall had cracked and had been replastered. Louise had her hearing on December 17, 1980 before Commissioner Massetto.

At the hearing, Louise stated she never "got" the $5,000 relocation bonus she was entitled to. She had to use the $5,000 for the house and she had wanted to use the money to pay for school and establish savings accounts for her children. Louise also reiterated the claims set forth in her request for a hearing. Louise said that the

heat did not circulate properly in the trailer and the furnace's pilot light had "blown up." As a result of the "blow up" her eyebrows were burned. However, Louise never informed anybody about her injury at the time it occurred or at a reasonable period thereafter.

Upon questioning by Commissioner Massetto, Louise stated that she had understood that pursuant to her relocation contract her $5,000 bonus would be applied to the purchase price of her new house. The Commissioner said Louise was not entitled to any more benefits. Commissioner Massetto did order that an inspection be made of Louise's relocation home. The Commission's counsel, Paul Tessler (Tessler), stated that he could not find a final inspection report on Louise's home. The file contained only the memos written in the fall of 1979 (referred to above) concerning the defects and release of the final draw. In other words, the memorandum about the September 27, 1979 "final inspection" was not viewed by Tessler as a final inspection report.

An inspection of Louise's home was performed by the Commission on December 22, 1980. A report was issued on January 16, 1981. The report stated that the home did not presently meet the required decent, safe and sanitary housing standards. However, the report stated, it did meet them at the time of purchase in 1979. It was estimated that $800 would be required to make the necessary repairs to Louise's house. The following problems were reported: signs of fire in the furnace unit, no electricity on one side of the home, evidence of mice, heat not distributed evenly, no locks on the doors, air filtration through outlets, windows, doors and cracks.

Troubles for Louise continued to mount. In January of 1981 she defaulted on her truck loan. Louise had used her relocation home as collateral for this obligation.

Louise received notice the loan had been accelerated. According to her complaint, Louise did not understand the significance of the notice and went to the Commission for help. She claims she was denied any assistance. However, an employee at the Commission referred Louise to one Henry King (King), a Navajo relocatee and licensed real estate salesman.[9] With the assistance of King, Louise sold her relocation home on January 12, 1981. According to two Commission memos, dated January 20, 1981, and January 26, 1981, Louise sold her relocation home for $50,000. It is to be remembered that Louise had used $49,233.17 in benefits to purchase the home. Thus the sale of her relocation home generated slightly more money than she had originally received in relocation benefits.

Louise, in January 1981, with the proceeds of the sale of her relocation home paid off in full her truck loan and purchased a new mobile home in Flagstaff. The new home cost $54,000. Louise put down $24,000 and had to finance (obtain a mortgage for) the rest of the purchase price of this new home. She was unable to stay current on her payments on this new home. In December 1983, Louise was evicted from her new mobile home and it was sold at a Deed of Trust sale. Louise then moved to public housing in Flagstaff. Currently she resides in public housing.

Louise claims that she was not counseled by the Commission following her relocation and was repeatedly denied assistance from the Commission. The Commission claims that it attempted to counsel Louise about her options with regard to the loan default. However, the Commission memorandum which supposedly supports this contention simply reported that the sale had already occurred and the Commission was "concerned" about the sale.

After Louise sold her second home, efforts were made to provide her with coun-

9. In her affidavit, Louise states that a receptionist at the Commission referred her to Henry King (King). She does not state, and none of the other evidence so suggests, that this reference was done as an authorized action on behalf of the Commission. It appears to have been strictly a personal referral. Plaintiffs advise in their brief that King, the subject of an investigation by the State of Arizona Department of Real Estate and the Office of Attorney General relative to his relocatee dealings, has been sued by one relocatee family in connection with fraudulent purchase and sale of relocation homes.

seling. On August 13, 1981 Louise made inquiries to the Commission about receiving help. On September 21, 1981 the Commission telephoned, on Louise's behalf, about unemployment and welfare assistance and food stamps. It was determined that she might qualify for these benefits and thus it was agreed she would contact the appropriate offices. On December 7, 1981 the Commission checked with NACA concerning Louise's progress. Contacts between the Commission and Louise continued into 1983. Finally, on April 22, 1983 the Commission closed its file on Louise's case. The reason given for this action was that Louise had sold her relocation home and therefore the Commission was not required to provide Louise with any further assistance. Under existing Commission regulations, the Commission, when two years had elapsed since the relocatee moved from the JUA, had discretion to terminate assistance to the relocatee. 25 C.F.R. § 700.135(e) (1983).

The relief sought by Louise in this litigation is similar to that sought by Esther and Joe. Her complaint also sets out three causes of action, each seeking a million dollars in damages. She seeks "direct and consequential" damages for breach of statutory duty (Count I) and "compensatory, consequential and incidental damages" for breach of trust (Count II) and breach of contract (Count III). These Counts appear to be alternative theories or bases for damage recovery. Louise seeks recovery for the following harms which she allegedly suffered: (1) her replacement home was defective and was never "decent, safe and sanitary", as required by the Act; (2) the Commission failed to provide counseling and assistance to aid Louise in relocation and failed to "assure the adequacy of services" at her homesite; and (3) "social, economic, psychological and cultural" harm suffered as a result of breach of trust.

## III.

### *Discussion*

#### a. Preliminary Statement

Both complaints in these consolidated actions contain the same format and their theories of recovery are identical. Each complaint sets forth three counts. Plaintiffs allege that the Commission under the Act was to relocate them and others, similarly situated, in a manner that minimized adverse social, economic and cultural impacts. Plaintiffs claim that as relocatees they were to enjoy a quality of life equal to or better than that which they had prior to relocation. Their failure to achieve this level of living, to which they claim entitlement under the Act, because of the Commission's breach of its duty to provide it for them, supposedly entitles them to recover damages in this court.

In the first count, plaintiffs allege that defendant, acting through the Commission, breached a statutory duty owed them under the Act. Plaintiffs allege defendant breached this statutory duty by failing to provide them with decent, safe and sanitary housing; by failing to provide them with counseling and assistance; by failing to help them cope with relocation; by failing to insure adequacy of services at the relocated homesite; and by failing to fulfill duties owed them in "other respects." As a result of these breaches plaintiffs claim they have suffered direct and consequential damages of $1,000,000.[10]

In the second count, plaintiffs allege that the Commission breached the trust duty owed them as Indians. Plaintiffs allege that the Act placed the Commission in the position of a fiduciary relative to plaintiffs as relocatees. As a fiduciary, plaintiffs argue, the Commission was required to meet stringent standards in its dealings with and on behalf of plaintiffs as relocatees. The duties of the Commission as a fiduciary, plaintiffs assert, include the ex-

---

**10.** It is to be noted that Esther and Joe Begay (No. 268–85L) claim $1 million as damages and Louise Begay (No. 335–85L) also claims $1 million as damages. This damage figure is not broken down into components direct or consequential. In fact, this one figure encompasses all claimed damages. This same amount is sought under Counts I, II, and III and presumably represents an alternative approach to damages. Recovery on one count would apparently preclude recovery on the other counts.

ercise of the utmost good faith toward plaintiffs; the exercise of reasonable due care and diligence in acting in plaintiffs' best interest; the utilization of all the skills and knowledge at its disposal to protect and assist plaintiffs; and effectuation of the intent of Congress, as expressed in the Act and implementing regulations. Plaintiffs claim the Commission's fiduciary responsibilities were especially exacting in these cases because the Commission was given complete control over the relocation program and property. Further, plaintiffs stress the lack of understanding of the relocation process, the reliance of plaintiffs on the Commission, the lack of formal education of plaintiffs and the Commission's awareness of these shortcomings. Plaintiffs contend the Commission breached its fiduciary duty in these cases by acts of commission and omission. The damages allegedly suffered by plaintiffs because of this breach include, but are not limited to, "adverse social, economic, psychological and cultural harm."[11] Plaintiffs, in each case, seek $1,000,000 as compensatory, consequential and incidental damages for this breach of fiduciary duty.

In the third count, plaintiffs allege that the Commission breached the "Contracts to Relocate" they executed. Plaintiffs allege that these contracts incorporated the duties, obligations and standards contained in the Act which were intended by Congress to govern the relocation process. Plaintiffs allege they have performed their parts of the contracts but that the Commission breached the contracts in a number of ways. The Commission, plaintiffs allege, breached the contracts by failing to provide decent, safe and sanitary replacement housing for plaintiffs and assuring its proper construction and installation; by failing to minimize the adverse social, economic and cultural impact of the relocation on

plaintiffs; by failing to provide plaintiffs with housing within their financial means; by failing to assure that community facilities and services were available at the relocation site; by failing to adequately prepare plaintiffs for their relocation and by failing to ensure that they successfully coped with their relocation; by failing to promptly and adequately assist plaintiffs when they encountered relocation problems; and, in the case of plaintiff Louise Begay, by failing to insure that she did not lose her home. As a result of these alleged breaches of contract, each of the docketed cases seek $1,000,000 as compensatory, consequential and incidental damages.

b. Breach of Statutory Duty

Plaintiffs' first count seeks relief based on defendant's breach of a statutory duty. The Tucker Act, 28 U.S.C. § 1491 *et seq.* (1982) confers jurisdiction on this court to, *inter alia,* "render judgment upon any claim against the United States founded * * * upon * * * any Act of Congress * * *." *Id.* § 1491(a)(1). Defendant argues that this court is without jurisdiction to hear plaintiffs' first count because no right to recover the type of damages plaintiffs seek is set forth in the Relocation Act. Therefore, defendant contends, plaintiffs' claims under Count I cannot be viewed as being founded on an Act of Congress.

An understanding of recent case law generated by the Supreme Court is helpful in determining whether or not plaintiffs have asserted valid claims under the Tucker Act. Recently, in *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*"Mitchell II"*) the Court held that the Tucker Act provided the Congressional waiver of sovereign immunity which is necessary to bring a suit against the United States. *Id.* at 216, 103 S.Ct. at 2967. *But see United States v.*

---

11. One further item concerning Esther and Joe's complaint bears note. Although not the subject of a specific claim for relief, the death of Esther and Joe's daughter Reba is detailed in the complaint. Esther and Joe assert that their inability to provide a satisfactory home for Reba caused them "severe psychological distress." The exact reason for including the facts and assertions concerning Reba's death within the complaint is

not clear. Obviously, Esther and Joe could not bring a suit in this court for wrongful death. That cause of action would sound in tort and be beyond the court's jurisdiction. 28 U.S.C. § 1491(a)(1) (1982). Likewise, if Esther and Joe are claiming that they have suffered "severe psychological distress" as a result of the Commission's action or inaction, this too would be a tort claim and beyond the court's jurisdiction.

*Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980) *("Mitchell I ")*; *Testan v. United States,* 424 U.S. 392, 398, 400, 96 S.Ct. 948, 953, 954, 47 L.Ed.2d 114 (1976).

However, the fact that the Tucker Act creates a waiver of sovereign immunity does not mean that it also creates a substantive right for money damages, i.e., a right on which a claim can be founded. *Mitchell II, supra,* 463 U.S. at 216, 103 S.Ct. at 2967. In *Mitchell II,* the Court preserved those portions of the holdings in *Mitchell I* and *Testan* that said the Tucker Act does not in and of itself create a substantive right to recover money damages against the United States. *Mitchell II, supra,* 463 U.S. at 216, 103 S.Ct. at 2967. The substantive right must be found in some other source of law such as a statute. *Mitchell II, supra,* 463 U.S. at 216–17, 103 S.Ct. at 2967–68. The right to recover money damages is essential to being able to bring a claim in this court because its jurisdiction is limited to money damages. 28 U.S.C. § 1491(a)(1); *United States v. King,* 395 U.S. 1, 2–3, 89 S.Ct. 1501, 1501–02, 23 L.Ed.2d 52 (1969).

Accordingly, in order for plaintiffs to bring a claim founded on a statute, pursuant to 28 U.S.C. § 1491(a)(1), they must successfully demonstrate that the Relocation Act creates a substantive right for money damages against the United States. The last word on the matter—*Mitchell II*—teaches that if plaintiffs can demonstrate the existence of this substantive right, they need not also show that the statute contains a waiver of the United States' sovereign immunity because the Tucker Act provides this waiver.

At present, it is not necessary that a statute expressly provide for a right to enforceable money damages. A claimant need only "demonstrate that the source of substantive law he [or she] relies upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.' " *Mitchell II, supra,* 463 U.S. at 216–17, 103 S.Ct. at 2967–68, quoting *Testan v. United States, supra,* 424 U.S. at 400, 96 S.Ct. at 954, quoting

*Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967). Thus, a claimant may be granted a right to recover damages by either express language or by implication. *Mitchell II, supra,* 463 U.S. at 217 n. 16, 103 S.Ct. at 2968 n. 16, citing *Eastport Steamship Corp. v. United States, supra,* 178 Ct.Cl. at 605, 372 F.2d at 1007.

If plaintiffs' claims for breach of statutory duty are to be viable in this court, plaintiffs must demonstrate that the Act creates a substantive right to recover money damages for the claims asserted. If they can make this demonstration, the Tucker Act will provide the necessary waiver of sovereign immunity and provide this court with the jurisdiction to hear the claims.

■ A determination that a statute can "fairly be interpreted" as providing the requisite substantive right for money damages "depends on the facts, and underlying substantive law, in each particular case." *Anderson v. United States,* 5 Cl.Ct. 573, 577 (1984), *aff'd,* 764 F.2d 849 (Fed.Cir. 1985). In *Anderson,* the court proposed a three-part test to determine if a statute can "fairly be interpreted" as mandating compensation. That test is as follows:

1) A right to a benefit is conferred by the statute;

2) The benefit conferred is economic in nature;

3) The government breaches its duty to confer the benefit.

*Id.* at 577. Upon examination of the present facts and underlying law (the Act) under the *Anderson* test, it can be seen that the Act can not be fairly interpreted as mandating compensation for the claims asserted.

■ The Act does confer a right to certain benefits to relocatees such as plaintiffs. Those benefits are economic in nature. Those benefits are payments for: purchasing the relocatees' property, § 640d–14(a); replacement dwellings, § 640d–14(b)(2); moving expenses, § 6403–14(b)(1) and relocation bonuses, § 640d–13(b). Without deciding the issue, it may be that if plaintiffs were alleging

that defendant had somehow breached its duty to pay any of the above benefits owed to plaintiffs, the *Anderson* test could support a holding that the Act be interpreted as mandating compensation. The plaintiffs would be alleging the Commission breached its duty to confer an economic benefit mandated by the Act. However, the facts clearly demonstrate that the Commission has not breached any such duty. It has paid plaintiffs all the economic benefits, listed above, due them under the Act. This critical fact plaintiffs do not deny.[12]

■ Plaintiffs seek $1,000,000 as economic "direct and consequential damages" attendant to their relocation, in addition to the benefits already paid them. The main flaw in plaintiffs' claims is their fundamental confusion over what the economic "benefits" are that are conferred by the Act. Plaintiffs contend that their right to more economic benefits than those outlined above were conferred on them by the Act. They argue that § 640d–14(b)(2) of the Act has conferred on them a discrete benefit of "decent, safe and sanitary" housing. In context, it is clear these words are precatory in substance and otherwise. The Act provides for a maximum dollar limit on the economic housing benefits that plaintiffs were to receive. Thus, the statute specifically limited the payment to an express dollar amount. Such a dollar limitation militates against a finding that Congress

intended to create some compensable benefit over and above that express housing benefit. The Act confers no right to any other benefits. As mentioned above, it is not disputed that these relocation benefits created by § 640d–14(b)(2) have been paid in full to plaintiffs.

■ At oral argument plaintiffs' counsel conceded that Esther and Joe had received a second relocation home and were prevented by the stipulation from making a claim based on entitlement to any housing relocation benefits. However, counsel argued that Esther and Joe still suffered economic harm and were entitled to recover damages. The damages which counsel claimed Esther and Joe were entitled to were for all "out of pocket" costs incurred by them between the time they purchased their first relocation home and the purchase of the second relocation home. Counsel cited as examples of these direct "out-of-pocket" damages during this claim period (roughly 1979–1986), taxi trips to the Commission and rental for temporary housing and medical expenses. Louise did not receive a second relocation home. She did, however, sell her first relocation home for a very slight amount over what she originally paid for it, thereby removing herself from the program. There is no dispute as to the fact that Louise received the full amount of relocation benefits she was entitled to

---

12. Any more rights Esther and Joe could conceivably have had for more economic benefits under the Act were settled when they entered into a "Stipulation and Agreement" with the Commission. Under the terms of the stipulation, Esther and Joe's relocation home was to be sold and the proceeds were to be used to purchase a new relocation home. The Commission agreed to provide that amount of money which when combined with proceeds of the sale from the first home would restore the family to "high benefits" available at the time of the purchase of the new (second) relocation home. (It is assumed "high benefits" were equivalent to the maximum relocation amount allowed under § 640d–14(b), which was subject to change over the years.) Esther and Joe, quite properly, were not entitled to an additional appraisal or bonus payment. The provision for high benefits was intended to resolve any issues of entitlement to benefits under § 640d–14. The stipulation also stated that the order dismissing Esther and Joe's housing appeal was full, final and complete.

According to its terms, the Commission could use the stipulation as evidence in an action by Esther and Joe for direct damages. As a result, this stipulation constitutes an accord and satisfaction relative to Esther and Joe's claim for all direct damages flowing from any failure to provide them with "decent, safe and sanitary housing." *See Merritt–Chapman & Scott Corp. v. United States,* 198 Ct.Cl. 223, 229, 458 F.2d 42, 45 (1972).

At times, such as at her administrative hearing, Louise has claimed she never received the $5,000 relocation bonus she was entitled to. However, her relocation contract clearly indicates that she received the bonus payment and applied it to the purchase of her relocation home. Louise stated at her administrative hearing she understood this. At this point Louise is no longer involved with the relocation program because she sold her relocation home. The sale of her relocation home was for slightly more than all of her relocation benefits combined.

when she was relocated. Although it was not mentioned at oral argument, presumably Louise is also claiming entitlement to "out-of-pocket" costs as damages. There is simply nothing in the Act to suggest that Congress intended to subject the United States to liability for damage claims that are supposedly traceable to relocation problems but which represent amounts different from and in addition to those benefits specifically created by the Act.

█ Plaintiffs also argue that additional compensable "benefits" are to be found in the language of the Act, e.g., taking into account the adverse social, economic, psychological, cultural and other impacts of relocation on the relocatees. *See* 25 U.S.C. § 640d–12(c)(2). Section 640d–12(c)(2) does not confer a right to *any* benefits, much less benefits of an economic nature. Section 640d–12(c)(2) merely states considerations that the Commission was supposed to take into account when it formulated its plan. Congress was obviously sensitive to the fact that relocating anyone from their home can be a traumatic experience and the situation was even more acute for the Navajos, some of whom were being removed from their ancestral homelands. Therefore, it wanted any plan devised by the Commission to take into account these facts and minimize their impact to the extent such minimization was possible. This, however, is a far cry from finding that the section somehow created a right to compensable economic benefits analogous to those considered in *Mitchell II* or *Anderson v. United States, supra.* By this section Congress was indicating that special concerns, hardly "economic" in nature, be taken into consideration in implementing the relocation plan. The Act, in the court's view, simply does not expressly or implicitly create substantive rights to money damages for the types of claims asserted by plaintiffs herein based on violation of statutory "duties." *See Mitchell I, supra,* 445 U.S. at 544, 100 S.Ct. at 1354.

In support of their breach of statute claims plaintiffs have cited to case law and statutory law. The court finds plaintiffs' citations unpersuasive. First, plaintiffs contend that their claims are analogous to the claims considered in *Mitchell II.* In *Mitchell II* the Supreme Court found that the purpose of the relevant statutes was to require the Secretary of Interior to manage Indian resources (timberlands) so as to generate *proceeds* for the Indians. *Id.* 463 U.S. at 227, 103 S.Ct. at 2973 (emphasis supplied). The claims in *Mitchell II* were based on the Secretary's failure to do so. Thus, the statutes on which the *Mitchell II* claims were based conferred a right to economic benefits on the plaintiffs. The claims of the plaintiffs in *Mitchell II* were based on an alleged breach by the government of its duty to confer these benefits. Those facts are in no way similar to the present action where the Commission has conferred all the economic benefits plaintiffs are entitled to under the statute and plaintiffs base their claims on other non-existent, "non-tangible" benefits.

*Duncan v. United States,* 229 Ct.Cl. 120, 667 F.2d 36 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983), relied on by plaintiffs, is also not controlling. In *Duncan,* the Court of Claims found that a cause of action for breach of trust was cognizable. *Id.* at 133, 667 F.2d at 44. The Court of Claims said the right to sue for money damages was created by a statute that established a trust and created trust duties. *Id.* Therefore, in making an argument relative to an alleged breach of statute reliance on *Duncan* is misplaced.

Plaintiffs also rely on *M.M. Crockin Co. v. Portsmouth Redevelopment and Housing Authority,* 437 F.2d 784 (4th Cir.1971) and *Home Furniture Co. of Charlotte v. Department of Housing and Urban Development,* 324 F.Supp. 1401 (W.D.N.C. 1971) to support their breach of statute argument relative to a duty defendant allegedly owed them under the Uniform Relocation Act. However, citation to these cases is unavailing because in neither case did the court hold that a breach of the statutory duty would entitle an individual to state a cause of action for money damages, a jurisdictional pre-requisite for an action in this court. *Eastport Steamship Corp. v. United States, supra,* 178 Ct.Cl.

at 607, 372 F.2d at 1009. *M.M. Crockin Co. v. Portsmouth Redevelopment and Housing Authority, supra,* did state that the plaintiff might have a cause of action for damages for breach of contract (not breach of any statutory duty). *Id.* at 791.

Finally, plaintiffs assert that certain statutory schemes, which the Court of Claims interpreted as creating causes of action for money damages, are "substantially identical" to the Act. The court finds that these statutes are not even similar, let alone "substantially identical", to the Act. Each one of the statutory schemes examined in the cases cited by plaintiffs clearly called for the conferring of economic benefits: 5 U.S.C. § 8331 *et seq.* (retirement benefits); 37 U.S.C. § 201 *et seq.* (back pay); 42 U.S.C. § 1395 *et seq.* (health insurance benefits). The Act in question contains no provision for economic benefits other than those provided in the Act itself, which, as indicated, have been paid plaintiffs.

On the particular facts of these cases, the court concludes that these facts are closer to the holding of *Mitchell I* than the holding of *Mitchell II.* To accept, as plaintiffs argue, the view that the Act creates a substantive cause of action for plaintiffs to recover cultural, social and psychological damages relative to their relocation out of Hopi territory is too large a giant step for this court to take. *See Gila River Indian Community v. United States,* 190 Ct.Cl. 790, 427 F.2d 1194, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). *See Eastport Steamship Corp. v. United States, supra,* 178 Ct.Cl. at 607–08, 372 F.2d at 1108–09. The wrongs complained of in these cases, where it is proper for the nation to provide a remedy, is, and should be, reserved for congressional determina-

tion. *Id.* at 611, 372 F.2d at 1011. The relocation issue, like the basic Hopi–Navajo dispute has not been fully resolved as of this date. The tribes themselves refuse to negotiate the many issues confronting them. Resolution of all these problems is for the Congress, not the courts. The documentary material now before the court, clearly supports this observation.

The court concludes there is no statutory basis for the types of claims asserted in plaintiffs' complaints.

### c. Breach of Trust

Plaintiffs' second theory for damage recovery is based on breach of trust. Under this theory, plaintiffs assert that it is a generally accepted proposition of law that in dealings between Indians and the United States Government a trust relationship exists.[13] It is true that there is an "undisputed existence of a general trust relationship between the United States and the Indian people." *Mitchell II, supra,* 463 U.S. at 225, 103 S.Ct. at 2972 (and cases cited therein). However, the existence of this "general trust relationship" does not automatically translate into the existence of an Indian cause of action for money damages for breach of trust in this court. *Mitchell I, supra.* Thus plaintiffs' reliance on various cases which highlight the general "trust relationship" between Indians and defendant, does not support, without much more, a right to recover damages merely because the plaintiffs are Indians. As the two *Mitchell* cases, discussed *infra,* show it is only a special, very pervasive trust relationship, based on a statute(s), which can give rise to a claim that is cognizable in this court. Congress can create a trust

**13.** Plaintiffs' attempt to invoke the "fair and honorable dealings" standard to create a "special relationship" between Indians and the United States is without merit in this case. "Fair and honorable dealings" was a basis for a cause of action specifically created by the Indian Claims Commission Act, § 2, as amended, 25 U.S.C. § 70a (omitted 1978). The Indians Claims Commission terminated on September 30, 1978 pursuant to 25 U.S.C. § 70v (omitted 1978). Plaintiffs are not asserting claims under this Act, and their attempt to utilize provisions from it is inappropriate under the circumstanc-

es of these cases. Even if the above-mentioned Act were applicable, plaintiffs would not fare any better. As Judge Davis pointed out in his concurring opinion in *Gila River Indian Community v. United States,* 190 Ct.Cl. 790, 427 F.2d 1194, 1201, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), " * * * the 'fair and honorable dealings' clause was [not] a catch-all allowing monetary redress for general harm—psychological, social, cultural, economic—done the Indians by the historical national policy of semi-apartheid."

relationship with Indians that does not subject the government to money damages for breaches of fiduciary duty but instead serves only a limited purpose. *See Mitchell I, supra,* 445 U.S. at 544, 100 S.Ct. at 1354.

In *Mitchell I,* the Supreme Court held that the trust created by the General Allotment Act was "limited" in scope. *Id.* at 543, 100 S.Ct. at 1354. Even though the Act stated that the United States held the allotted lands "in trust" for the Indians, the Court found that such language was used solely to ensure that the land was not alienated by the Indians or taxed by the states and "not because it wished the Government to control use of land and be subject to money damages for breaches of fiduciary duty * * *." *Id.* at 544, 100 S.Ct. at 1354. *Mitchell I* found that although there was a general trust relationship between the Indians and the government, that relationship, in the context of the claim asserted based on the General Allotment Act, did not impose upon the government a fiduciary duty to control the land, i.e., manage the timber resources and be subject to money damages, if it breached that duty. *Id.*

In *Mitchell II,* the Supreme Court found that other statutes, not cited to it in *Mitchell I,* imposed on the government the duty to manage Indian timber lands for the economic benefit of the Indians. The Supreme Court, in *Mitchell II,* pointed out that under 25 U.S.C. §§ 406, 407 the government's role in the sale of Indian-owned timber was "pervasive", *id.* 463 U.S. at 219, 103 S.Ct. at 2969, and the government " 'exercises literally daily supervision over the harvesting and management of tribal timber,' " *id.*

at 222, 103 S.Ct. at 2970 quoting, *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 147, 100 S.Ct. 2578, 2585, 65 L.Ed. 2d 665 (1980). It held that by an aggregation of the various statutes and regulations a fiduciary duty was imposed because the government was given "full responsibility" to manage Indian resources. *Id.* 463 U.S. at 224, 103 S.Ct. at 2972. The fiduciary duty "necessarily arises when the Government assumes such elaborate control" over Indian property. *Id.* at 225, 103 S.Ct. at 2972. The court then held that the statutes and regulations in question clearly established a fiduciary duty that could be "fairly interpreted" as mandating compensation for damages. *Id.* at 226, 103 S.Ct. at 2973.[14] Because the statutes and regulations cited could fairly be interpreted as mandating compensation for breach of the fiduciary duty, the Court of Claims had jurisdiction over the plaintiffs' claims for breach of trust in *Mitchell II.* *Id.* at 228, 103 S.Ct. at 2974. *See* section b *supra.*

■ *Mitchell II* holds that if a statute(s) creates a fiduciary relationship between the United States and Indians then by *implication* that statute(s) may be read as mandating compensation for a breach of the fiduciary duty. *Mitchell II, supra,* 463 U.S. at 226, 103 S.Ct. at 2973. This court would have jurisdiction over such a claim for money damages based on a breach of the fiduciary duty created by the statute(s). 28 U.S.C. § 1491(a)(1); *United States v. Testan, supra,* 424 U.S. 392, 96 S.Ct. 948; *Easport Steamship Corp. v. United States, supra,* 178 Ct.Cl. 599, 372 F.2d 1002. However, before a cause of action can be inferred from the statute(s), it must first be shown that a fiduciary duty was

---

**14.** Several reasons were given to support the conclusion that the statutes in question which created a fiduciary relationship could fairly be interpreted as mandating compensation. First, the government, like any trustee, should be liable in damages for breach of its fiduciary duty. Second, federal courts recognize that a fundamental incident of the general Indian–United States trust relationship is the right of an injured Indian beneficiary to sue for damages. Third, the damage remedy would further the purpose of those statutes and regulations which required the Secretary of Interior to manage Indian resources so as to generate proceeds for

the Indians. If a damage remedy were not allowed, it was reasoned, the value of the resources could only be obtained if the Secretary performed his duties. The court felt that under these circumstances the Indians must have a forum for redress if the Secretary did not fulfill his duties. *Mitchell v. United States,* 463 U.S. 206, 226–27, 103 S.Ct. 2961, 2973, 77 L.Ed.2d 580 (1983) (*Mitchell II*). It is felt, in the cases at bar, that the forum available to the relocatees for redress of their grievances arising out of the relocation was the Congress. Some redress has been obtained from Congress in the past and that forum is still available to the relocatees.

created by that statute(s). The plain language of the statute(s) alone may not be dispositive of whether or not the fiduciary duty was created.

In *Mitchell I* the Supreme Court held that a fiduciary relationship was not created by the General Allotment Act even though it said the lands were to be held "in trust." On the other hand, in *Mitchell II* the court found a fiduciary relationship was created, even though the word "trust" was not used in any of the pertinent statutes, because of the pervasive degree of control the United States exercised over management of the timberlands pursuant to the statutes. The Supreme Court in *Mitchell II* used phrases such as "full responsibility" and "elaborate control" to describe the government's role. This type of all encompassing responsibility which the *Mitchell II* court found was imposed on the United States by the various statutes is not to be found in the Relocation Act.

■ The Act created a much more limited duty. The provisions of the Act were specific and direct in the economic duties and obligations it imposed. Those specific economic duties and obligations were met in these cases. There is no indication of Congressional intent to impose on the Commission the pervasive control, supervision and management of Indian property or Indian life—social, cultural or otherwise in the Act as was the case of the statutes at issue in *Mitchell II.* Therefore, the requisite fiduciary duty that plaintiffs seek to impose on the Commission cannot be found in the Act, nor can the language of the Act be fairly interpreted as mandating compensation for an alleged breach of trust relative to the types of claims for which recovery is sought.

Plaintiffs argue that the Act created a trust relationship between the relocatees and defendant equal in scope to that which was found in *Mitchell II.* They say the

trust created by the Act is "general and unlimited" because nothing in the statutes, regulations, course of administrative conduct or legislative history suggests that the trust had a restrictive purpose or failed to cover the general oversight and control of the relocation program.[15]

Under plaintiffs' scenario, the Act supposedly created "clear and express" duties which defined the trust responsibilities owed to plaintiffs. A source of the supposed trust duties is claimed to be 25 U.S.C. § 640d–12(c). This section sets forth certain considerations that the Commission was required to take into account when it formulated its relocation plan. Obviously, Congress, by requiring such consideration, showed that it felt these considerations to be of some importance. However, that is a far cry from saying that the Congress intended the creation of a trust relationship by enacting this section, or that the duties of that trust relationship are spelled out by § 640–12(c). As discussed in the previous section, Congress was aware of the stress of relocation and wished to soften its impact if possible. This alone cannot be said to have created a trust relationship.

Additionally, plaintiffs claim that § 640d–14 created a fiduciary duty upon the Commission to provide "decent, safe and sanitary" replacement dwellings. In the previous section the court has already pointed out that § 640d–14(b)(2) which provides for the purchase of "decent, safe and sanitary" dwellings also fixes a limitation on the amount of benefits to be paid. The section can hardly be read as creating an all encompassing trust duty, like that found in *Mitchell II,* to ensure that "decent, safe and sanitary" housing was provided when it specifically limited the dollar amount of benefits relocation families were entitled to. Given the set dollar limits, the phrase "decent, safe and sanitary" must really be viewed as precatory in nature.

15. This is almost a verbatim repeat of the language used by the Court of Claims in *Duncan v. United States,* 229 Ct.Cl. 120, 667 F.2d 36, *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983), in discussing the existence of a trust relationship in that case. *Id.* at 130, 667 F.2d at 42. However, the situation in *Duncan v.*

*United States, supra,* was very different from the one in the instant actions. *Duncan* was analogous to *Mitchell II.* In *Duncan* a very pervasive day-to-day relationship between the government and the Indians over a period of years gave rise to a trust relationship, the breach of which supported a damage claim.

Plaintiffs' reliance on various housing regulations is also not persuasive. The bottom line remains; Congress expressly set forth by statute the amount of money each relocated family was entitled to receive. To accept plaintiffs' trust theory of recovery, would emasculate the intent of Congress as expressed in the Act, i.e., to cap the monetary benefits to be paid plaintiffs for relocation homes.

According to plaintiffs, Congressional and Commission action subsequent to passage of the Act also support their view that a compensable trust relationship was established by the Act. Plaintiffs point to section 3 of Pub.L. No. 96–305, 94 Stat. 929 (1980), which amended the Act. In actuality, section 3 was enacted because Hopi Indians on the Navajo side of the JUA and Navajo Indians on the Hopi side of the JUA were being harassed. The 1980 amendment was directed at this situation. This protection purpose is confirmed in the Joint Explanatory Statement of the Committee of Conference, 126 Cong.Rec. 14918 (1980) and the remarks of Rep. Marriott, a member of the Conference Committee, 126 Cong.Rec. 16824 (1980). The fact that Congress amended the Act also suggests that Congress looked to itself to correct any problems that existed in relocating the Navajos and Hopis. The 1980 amendment also runs counter to plaintiffs' view that the Act established the Commission as a fiduciary in all its dealings with the relocatees. Congress, it would appear, retained for itself the final word on this matter of relocation and remained the fountain head of remedies for deficiencies in the relocation program.

Plaintiffs cite to language to be found in annual reports prepared by the Commission and a Congressional investigation report relative to problems with the relocation program and process which contained suggested remedial recommendations as evidence of the existence of a trust relationship. These reports do detail problems that existed in relocating the Indians and they do cite deficiencies in the then existing system.[16] However, these reports can not be viewed as support for finding an "all encompassing" trust relationship of the type envisioned by plaintiffs. Indeed, the fact that the Commission reported back to the Congress annually would indicate that Congress never intended to create a fiduciary relationship between the Commission and the individual Indians. Ultimate control over what the relocatees were entitled to was always to remain with the Congress. Solutions to problems with the program were to be brought to the attention of Congress for remedial action, not to the courts for judicial determinations. The Commission was to be a facilitator for providing relocation benefits, but it was not intended to have the powers of a trustee in a pervasive day-to-day relationship whose duties would be monitored by the court, and whose actions or inactions would subject the government to damage claims.

In its analysis of the fiduciary relationship in *Mitchell II*, the Supreme Court pointed to the existence of the three required elements for a common law trust: (1) beneficiary (Indians), (2) trustee (United States) and (3) corpus (timber, lands, funds).[17] In the instant action the final

**16.** As defendant points out in its reply brief, these reports, while informative, do not carry the force of law like statutes or regulations. Furthermore, on March 1, 1985 the Commission presented its own report in response to the Congressional investigation report. In this report, the Commission took exception to many of the issues raised and comments made in the Congressional investigation report. Thus, there is by no means a consensus between Congressional investigators and Commission members.

**17.** In *Nevada v. United States,* 463 U.S. 110, 127–28, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983), the Supreme Court noted the recognized distinctive obligation of trust incumbent upon

the government in its dealings with Indian tribes and observed these concerns have traditionally focused on the Bureau of Indian Affairs within the Department of Interior. The Supreme Court further noted in *Nevada, v. United States, supra,* that the provisions relating to private trustees and fiduciaries, while useful as analogies, cannot be regarded as finally dispositive in a government—Indian trustee—fiduciary relationship in any event. In trying to resolve the dispute between the Hopi Tribe and the Navajo Tribe, which the Tribes refused to resolve themselves, it is simply unrealistic to saddle the Commission with "fastidious standards of a private fiduciary" in matters relating to the

trust element is missing. There is nothing in these cases that can reasonably be viewed as a trust corpus. The existence of the general Indian-government trust relationship does not create a property interest where one does not otherwise exist. *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 705–08, 107 S.Ct. 1487, 1491–92, 94 L.Ed.2d 704 (1987). The bonus money which was paid by the Commission pursuant to the Act was given to the relocatees free and clear. When a home was purchased with appraisal and relocation benefits it belonged to the relocatees.[18] There simply is nothing for the defendant to be trustee of. All the tangible monetary benefits of the Act were paid to plaintiffs. The intangible benefits damages for social, cultural and psychological harms that plaintiffs seek are matters not subject to damage ascertainment but rather are matters more properly reserved for Congressional consideration and action. *Gila River Indian Community v. United States*, *supra*. The economic benefits plaintiffs seek for the most part are integrated in these claims for social, cultural and psychological harms.

▮▮▮ Further, an even more important requirement for the creation of a trust is missing in the present actions. An essential ingredient of a trust is the intent of a settlor to create the trust. *See* Restatement (Second) of Trusts §§ 2, 23, 25 (1959). There does not appear to be any evidence that Congress intended that the Act create a trust as envisioned by plaintiffs and impose on the commission the full panoply of trustee duties relative to all activities of

Indian relocatees. Congress imposed financial caps on relocatee benefits. The Commission was not given unlimited funds for operation or personnel purposes. These limitations speak against establishment of a trust relationship of the type envisioned by plaintiffs. Further, the fact that Congress monitored the relocation process, amended the Act when necessary to meet problems relative thereto, and required the submission of reports and conducted investigations suggests that Congress intended to exercise pervasive control over the relocation process and that it would provide remedies in the program or process as needed. These facts militate against any intent by Congress to create any fiduciary relationship between the individual Indians and the Commission. In passing the Act, Congress attempted to resolve an undesirable situation, i.e., the Navajo and Hopi land dispute. Plaintiffs assert that like the situations in *Mitchell II* and *Duncan*, Congress took corrective action. Yet taking action to solve a problem can hardly be equated with the creation of a trust. Through the Act, Congress established a system to provide certain benefits and hopefully help make the relocation process less upsetting. Congress, unlike the situation in *Mitchell II*, did not, in the Act, give the Commission pervasive control over, and complete supervision and management of plaintiffs' property and lives. Indeed, plaintiffs' complaint really is the opposite, i.e., they complain because the Commission did not exercise complete control over their property and their lives so as to ensure that their economic welfare was

---

cultural, social and psychological Indian psyche relative to their relocation. *See id.* at 128, 103 S.Ct. at 2917. Plaintiffs' labeling of their claims as "economic" does not change this conclusion.

**18.** Some of plaintiffs' submissions indicate that in 1984 the Commission started placing restrictions in some of the relocatees' deeds which inhibited relocatees from selling or encumbering their relocation homes for two years after purchase without first discussing the matter with the Commission. However, after such discussions, the relocatee had the right to sell his or her home within the two year period. Furthermore, imposition of this restriction began long after plaintiffs had received their relocation homes. Finally, the Commission's use of

such a restriction on a limited basis cannot be viewed as amounting to a Congressional creation of a *Mitchell II* type trust. In *Mitchell v. United States*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*), the Supreme Court found that the purpose of the Act under consideration therein was to, *inter alia*, prevent Indians from conveying their land. *Id.* at 544, 100 S.Ct. at 1354. Yet this purpose was not enough to create a trust relationship in which the government was subject to money damages. The restriction also indicates that the Commission was not as inactive relative to the relocation program and the interests of the relocatees as plaintiffs would have one believe.

prosperous and assured and their social and cultural existence unchanged.

Plaintiffs' breach of trust claims center on two areas. Plaintiffs claim the Commission breached its duty in the area of housing and in the area of counseling. As to the housing area, plaintiffs' briefs contains many pages detailing problems they had with their relocation homes. Numerous defects are reported. The kinds of defects have been noted in the factual portion of the opinion. Plaintiffs also assert that at the time they were relocated, the Commission did not have any verifiable housing standards or inspection procedures in place. The materials at hand seem to support this assertion.

As this opinion has repeatedly pointed out, plaintiffs have been paid the full amount of the monetary benefits they were entitled to under the Act. The fact that the homes had defects and may not have been properly inspected cannot take away the fact that the Congress has established a maximum benefit to which the relocatees are entitled. The court is sympathetic to plaintiffs and the fact that their homes had problems, but it cannot find that an unlimited trust duty to ensure the quality of the relocation homes was created by the Act when it also provided for an express limitation on the amount of benefits the relocatees were to receive.[19] While it took a long time, Esther and Joe finally resolved by settlement their housing problems. When money became available to the Commission, it established a housing repair program. That money came from Congress. Louise sold her relocation home in January 1981, thereby removing herself from the relocation program. As stated earlier, the remedies for the problems of the relocation program more properly rest with Congress rather than the courts. Congress has responded to these problems from time to time. On this record, given Joe and Esther's settlement with the Commission, and

resulting accord and satisfaction, and Louise's sale of her relocation home because of her own actions, plaintiffs' housing problems and related claims, to the extent they are of a bona-fide economic nature, fail to state a claim on which relief can be granted.

■ As to the counseling area, plaintiffs contend the Commission breached its duty to provide counseling to plaintiffs. The submissions before the court demonstrate that plaintiffs were provided with some counseling services. The totality of the materials before the court suggests that more counseling services should have been provided. The lack of more counseling was due to lack of manpower and money. These factors are remedies that Congress alone could provide.

Plaintiffs' claims demonstrate the inherent dangers in asserting that the Act created a fiduciary duty on the part of the Commission to counsel the relocatees. It would then put the court in the position of having to make a qualitative and quantitative analysis of the counseling sessions to say what is sufficient to meet the fiduciary duty. Moreover, it is most speculative and conjectural to suggest that Louise, for example, would not have encumbered her house in order to buy a truck if she had been counseled not to do so. The court feels the Congress never intended to create such a situation. This is evidenced by the fact that the Commission was instructed to report back to Congress and also by the fact that the Congress undertook a review of the relocation program, including the counseling services. This demonstrates that Congress felt it was the proper body to correct problems concerning counseling. In cases such as this where it may be proper for the nation to furnish a remedy "Congress has wisely reserved the matter for its own determination. It certainly has not conferred it on the Court of Claims [Claims Court]." *Eastport Steamship*

---

19. In their argument concerning housing, plaintiffs also allege that the entire relocation program, in particular the connection between the Commission and Village Homes, was full of dubious dealings. They also allege false representations were made to them by Commission members. As discussed, *infra,* these allegations are tortious in nature and beyond the jurisdiction of this court. *See Somali Development Bank v. United States,* 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974).

*Corp. v. United States,* 178 Ct.Cl. 599, 611, 372 F.2d 1002, 1011 (1967).

In summary, the court is not persuaded that Congress intended to create a trust relationship between plaintiffs and the Commission by passage of the Act, the breach of which would give rise to the type of money damage claims against the government asserted by plaintiffs in their complaints. *See Mitchell I, supra,* 445 U.S. at 544, 100 S.Ct. at 1354.

### d. Breach of Contract

■ Plaintiffs' third theory for recovery is based on breach of contracts. In the Spring of 1979, Esther and Joe, and Louise entered into agreements with the Commission entitled "Contract for Relocation". Plaintiffs' claims are based on what they perceive as the Commission's breach of these contracts. Defendant counters by saying that the agreements are not really enforceable contracts. It alleges that the mere title of the document, i.e., *"Contract for Relocation"* (emphasis added), cannot in and of itself make something a contract. Because, defendant continues, the contracts are not really contracts, plaintiffs' claims cannot be stylized as breach of contract and are therefore beyond the "contract claim" jurisdiction of this court. *See* 28 U.S.C. § 1491(a)(1). The court finds that a "Contract for Relocation" is indeed a contract. Therefore, the court has jurisdiction over plaintiffs claims. However, the court finds the Commission did not breach these contracts.

A contract between the United States and a private party, like a contract between two private parties requires valid consideration flowing from each party to the other. *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 492, 43 S.Ct. 592, 593, 67 L.Ed. 1086 (1923); *Ronald A. Torncello and Soledad Enterprises, Inc. v. United States,* 231 Ct.Cl. 20, 41, 681 F.2d 756, 768 (1982).

Although not totally clear from its briefs, defendant appears to argue that plaintiffs have furnished no consideration relative to the Contracts for Relocation. Defendant, claims that because plaintiffs

lived on the Hopi side of the JUA, they would eventually have had to move anyway and therefore any promise to relocate would simply expedite the inevitable and thus cannot be deemed consideration sufficient to support a contract. Instead, defendant argues, the Commission was simply securing "voluntary compliance with a statutorily mandated relocation."

The court rejects defendant's argument. It finds that there was the requisite consideration flowing from both parties. True, under the Act, plaintiffs eventually would have to leave their homes on the Hopi side of the JUA and the Commission would have to pay them certain benefits. However, plaintiffs vacated their homes years before they were required to do so. They signed their Contracts for Relocation in 1979. The report and plan created pursuant to the Act was not even implemented until 1981. Indeed, this early relocation, which was a critical feature of the contracts which plaintiffs executed, was the source of many of the problems of the early relocation program. Presumably, it would be years after implementation of the plan before all those who were required to relocate did so. Because plaintiffs agreed to leave their areas before being *required* to do so, each family was paid a bonus of $5,000. *See* 25 U.S.C. § 640d–13(b)(1). Payment of bonuses pursuant to § 640d–13(b) was dependent upon when a head of household contracted to relocate. The longer a head of household delayed relocating the smaller the bonus would be. If the delay before relocation was long enough there would be no bonus.

Additionally, the other monetary benefits received by a relocatee were also tied to the time of relocation. The payment for a replacement dwelling established by § 640d–14(b)(2) was limited by an express dollar amount contained within the statute. However, the ceiling amounts were subject to an annual increase or decrease by the Commission, after consultation with the Secretary of Housing and Urban Development. Therefore, by choosing to relocate at a time prior to when he or she was required to, the relocatee could be basing his or her decision on the level of replace-

ment dwelling benefits as they then existed. Finally, the benefits paid for the purchase of a relocatee's real estate improvements were based on their fair market value, 25 U.S.C. § 640d–14(a), and the reimbursement for moving expenses was for actual costs incurred, § 640d–14(b)(1). Either of these figures could also vary depending upon when a relocatee agreed to move. For example, the fair market value of a relocatee's real estate improvement could decrease or increase over time, depending on the local real estate market. The direction of the change in value could potentially influence a relocatee relative to the time he or she would agree to relocate.[20]

Therefore, even though ultimately all those Indians who lived on the wrong side of the JUA designated for occupancy by the two tribes would be required to relocate, there was enough flexibility and incentives within the Act that agreements of a contractual nature could be entered into. As happened in these two cases, relocatees agreed to move early in exchange for which they would receive bonus payments and other payments which could potentially be different had they elected to relocate at a later time.[21]

Defendant also appears to intimate that even if the Contracts for Relocation are indeed contracts, an action based on their breach is still beyond the jurisdiction of this court. In support of this argument, defendant relies on the following language from a Court of Claims decision:

> [T]he contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement,

understanding or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands and services, transactions such as private parties, individuals or corporations also engage in among themselves. * * *

*Kania v. United States,* 227 Ct.Cl. 458, 464, 650 F.2d 264, 268 (1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).

The "contract" involved in *Kania* was very different from the ones involved in the present actions. In *Kania,* the plaintiff sought damages for what he claimed was breach of contract made between himself and a United States Attorney concerning his cooperation in a criminal investigation and prosecution in exchange for his not being prosecuted. Thus the "type" of contract involved in *Kania* was not at all like the contracts involved in the instant action. The present cases involve contracts more like those described in the second sentence of the passage from *Kania,* quoted above. In every day real estate transactions, tenants are constantly contracting with owners to vacate the premises early or extend the existing lease for a price benefit of some kind. It is not unreasonable to place the situation at hand in the mold of that type of transaction. It is concluded the court has jurisdiction over plaintiffs' contract claims.[22]

---

**20.** Of course this point would have no direct relevance in the case of Esther and Joe because they owned no real property improvements. The record is unclear as to Louise in this regard. The record indicates Louise was renting a home prior to relocation. Yet, the record also indicates she received $4,733.17 as "appraisal funds."

**21.** It is interesting to note that defendant does admit, almost in the middle of its "no contract" argument, that plaintiffs were receiving "a benefit they could qualify for only if they agreed to voluntarily relocate." However, defendant argues that such an agreement "should not be viewed as a contract for the benefit itself." To

support this position defendant cites *Somali Development Bank v. United States, supra,* 205 Ct.Cl. 741, 508 F.2d 817. The court, on the facts, finds that case inapposite.

**22.** In any event, in *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981), the Court of Claims said that a contract subject to Tucker Act jurisdiction creating liability for breaching a plea bargain agreement or granting immunity for giving testimony *could* be made. *Id.* at 465, 650 F.2d at 268. The court would look for the United States Attorney's specific authority to make an agreement obligating the

Having decided that the court has contract jurisdiction in these cases, the court must now decide if the contracts have in fact been breached. Each of the contracts is a fairly short document, four pages long and containing eight sections. Plaintiffs spend many pages of their brief, in various places throughout the section dealing with breach of contract, arguing that the obligations of the Commission under the contracts should not be defined solely by the express terms of the contract. Plaintiffs claim the "duties" allegedly created by the Act and the fiduciary duties of the supposed trust relationship between the relocatees and the Commission should also be incorporated into the contract. As authority for this proposition plaintiffs cite to *M.M. Crockin Co. v. Portsmouth Redevelopment and Housing Authority, supra,* 437 F.2d at 791. This citation is misplaced. In the *M.M. Crockin Co.* case the court at no time held that duties existing outside a contract could be *incorporated* into the contract without appropriate language in the contract permitting such incorporation. The court stated that under the circumstances of that case the contract at issue had to be viewed in *connection* with a separately created statutory duty. *Id.* As demonstrated above, there is no such statutory duty in the case at bar.

In fact, plaintiffs' argument directly contradicts the rule that, "[i]n suing for a breach of contract plaintiff[s] must rely on the express terms of the contract and can not, as it has attempted to do here, import into the agreement terms outside of those expressly contained in the agreement." *State of Texas v. United States,* 210 Ct.Cl. 522, 531, 537 F.2d 466, 471 (1976), citing *New Jersey Foundry and Machine Co. v. United States,* 49 Ct.Cl. 235 (1914).[23]

Flowing from the belief that the duties "imposed" by statute and "trust" must be incorporated into the contracts are plaintiffs' various arguments that the Commission was required to do many things to fulfill its obligations under the contracts. These supposed additional contractual duties have already been discussed in the previous sections dealing with its statutory and trust theories of recovery. The contracts speak for themselves. To the extent the contracts impose duties on a party, that party must perform them or run the risk of being held in breach. However, the parties are responsible only for performance of those obligations specified in the contract, and not any duties supposedly created by other sources. *See State of Texas v. United States, supra,* 210 Ct.Cl. at 531, 537 F.2d at 471.

In their briefs, plaintiffs claim the Commission had a contractual duty to fix substandard housing. Nothing in the terms of the contracts impose any such duty. According to plaintiffs, under the contracts the Commission was to provide plaintiffs with "decent, safe and sanitary" housing and prepare them to assimilate into non-Indian culture. Again, an examination of the terms of the contracts reveal no such obligations on the part of the Commission. Also, plaintiffs assert the Commission failed to fulfill its contractual obligations under the relocation plan because it did not provide "services" and benefits. Yet, under the terms of the contracts the Commission was not required to provide "services", only benefits, and those were paid in full.

Furthermore, everyone of the specific assertions in plaintiffs' breach of contract claims allege breaches of duties which simply were not created by the express terms of the Contracts to Relocate. Basically, the contracts set out the amount of the benefits plaintiffs were to receive in exchange for their relocation. They do not

---

United States to pay money and spell out how the United States' liability could be determined. *Id.* There was no attempt to show such authority in *Kania.* In the cases at bar, the statute conferred authorization on the Commission to contract with plaintiffs.

23. In *State of Texas v. United States,* 210 Ct.Cl. 522, 537 F.2d 466 (1976), the plaintiff argued that regulations promulgated by an executive agency should be viewed as establishing duties for the defendant under a contract. The court rejected this claim because the regulations were not incorporated into the contract. *Id.* at 531, 537 F.2d at 471.

include terms concerning such things as "minimizing the impact" of relocation or "assuring community facilities and services." It is duties such as these that in their third counts plaintiffs allege the Commission breached. Plaintiffs appear to be aware of the fact that the contracts are silent as to the duties they claim were breached because they actually claim the Commission has breached its obligations "under the Contract, as supplemented by the Act." However, as the court has pointed out, the contracts are not "supplemented"; they simply stand on their own language and the only duties they create are set forth by the express terms of the contracts.

The "Contracts for Relocation" provide for the payment of an incentive bonus, replacement housing costs, and moving expenses. In Louise's contract a provision is also made for the payment of appraisal funds. Louise also agreed to combine all payments (including her bonus payment and moving expenses) she received to purchase her relocation home. Both contracts call for the establishment of an escrow account. The Commission was to place the money to be used for buying the relocation housing into the escrow accounts. The money for Esther and Joe's house was to be released to Leisure Homes after their home was set on a foundation and passed final inspection. Louise's contract established a schedule to release payments to Village Homes as construction progressed.

After the contracts were executed, they were fully performed by the Commission. It made full payment of all benefits under the contracts. The only conceivable way in which the Commission could be viewed as having "breached" the contract is by releasing the escrow payment for Esther and Joe's home when the home was not set on a foundation, *see* Contract § 6(2)(d)(a), or by not fully performing the inspections called

for in the contracts.[24] But these types of claims, as indicated earlier, were settled by Esther and Joe and thus constitute an accord and satisfaction, a valid defense to any claim for breach of contract in these cases. *See* n. 12, *supra.* Louise sold her relocation home, at a slight profit, thereby removing herself from the relocation program. In any event, the fact remains that plaintiffs were paid the full amounts called for in the contract. "It has long been the rule that when an officer or agency of defendant [U.S. Government] does all it agreed to do, and all it was authorized to undertake, a plaintiff can ask no more of the Government." *State of Texas v. United States, supra,* 210 Ct.Cl. at 530, 537 F.2d at 470, citing *Moline Water–Power Co. v. United States,* 20 Ct.Cl. 331 (1885). Thus plaintiffs could not recover any more direct damages, even if a breach had occurred. Any possible claim for recovery would be for consequential damages, which are not recoverable. *See* section e, *infra.*

e. Damages

Even assuming, *arguendo,* jurisdiction and a finding that plaintiffs have asserted valid claims for breach of statute, trust or contract, they seek types of damages that would not be recoverable. Plaintiffs seek consequential damages for the alleged breach of statute. These are clearly not recoverable. *Duncan v. United States, supra,* 229 Ct.Cl. at 139, 667 F.2d at 48. A valid claim for breach of statutory duty would be premised on the fact that the Act could fairly be interpreted as mandating compensation for the damage suffered. *Testan v. United States, supra,* 424 U.S. at 400, 96 S.Ct. at 954; *Eastport Steamship Corp. v. United States, supra,* 178 Ct.Cl. at 607; 372 F.2d at 1009. However, even if the Act could be interpreted to mandate compensation "it does not follow that the congressional scheme mandates compensation for every conceivable form of dam-

---

24. Esther and Joe claim that a valid inspection was never performed on their mobile home at the time of installation. They allege that the Commission's inspector assigned to them simply remained in his vehicle while he was supposed to be inspecting their home. The initial inspection of Louise's home found 26 defects. These

were supposedly corrected. A subsequent memo ordered that the final payment be made. However, many of these same defects were found again when an inspection was made after the housing appeal hearing. Louise intimates this establishes that the defects were never corrected.

ages." *Duncan v. United States, supra*, 229 Ct.Cl. at 138, 667 F.2d at 47. The *Duncan* court found that claims for consequential damages for emotional and psychological injury went "far beyond the types of damage normally awarded and we cannot find any express or implied Congressional authorization for such a recovery." *Id.* at 139, 667 F.2d at 48. The court finds the holding of *Duncan* to be controlling in the present action and therefore plaintiffs would not be entitled to consequential damages even if a breach of statute had occurred.

Under its breach of trust theory, plaintiffs again ask for consequential (and incidental) damages for social, psychological and cultural harms. The plaintiffs in *Duncan* sought very similar damages. The Court of Claims said that the *Duncan* plaintiffs' claims for injury to native culture and psychological harm were "premised on unusual theories." *Id.* at 136, 667 F.2d at 46. The court surveyed the recent Indian cases in which a government breach of trust had been alleged and found "that monetary damages have been limited to tangible direct injuries to property or to direct losses due to denial of required services * * * [the survey] reveal[ed] no cases in which any court considered damage claims as nebulous and remote as some urged here." *Id.* at 136–37, 667 F.2d at 46–47.

■ Like the claims in *Duncan*, the court feels that in the present actions, plaintiffs' claims for social, cultural and psychological harms are beyond the scope of the standards Congress has often established for managing Indian trusts. *Duncan v. United States, supra*, 229 Ct.Cl. at 139, 667 F.2d at 48. Also, they are not the sort of injuries where private trust law has provided standards of duty or measurements of damages. *Id.* at 140, 667 F.2d at 48. Absent any statutory or common law standards of duty or compensation and without express Congressional authorization, the court finds that the Act does not provide any mandate for allowing consequential damages for alleged psychological, social and cultural harms.

A further pragmatic concern in awarding plaintiffs the type of damages sought would be the considerable difficulties in assessing causation and the appropriate quantum. *Duncan v. United States, supra*, 229 Ct.Cl. 140 n. 23, 667 F.2d 48 n. 23. Additionally, it would be very difficult to assess what the Navajo culture was before the alleged breach and the impact of the breach on that culture. *Id.* The materials before the court indicate that generally the Indian Navajo families eligible for relocation benefits fall into two broad cultural categories distinguished predominately by age. The "traditional" older Navajo clings to the old "Navajo way" and many do not speak English. Their work skills, generally raising livestock which is an intricate part of their social, cultural and religious life, are probably unmarketable in today's world. The traditional Navajo lives on the Reservation, in hogans, without benefit of utilities or modern conveniences. On the other hand, the younger, more acculturated, Navajo is sometimes educated, self-supporting and maintains a residence off Reservation, returning only to visit. The majority of the younger Navajos are, it is said, in some stage of transition from the traditional way of life. Many of the younger Navajos tend to drift on-and-off the Reservation. Relocation affected, and effects, these two broad categories of Navajos in significantly different ways and degrees.

Finally, the *Duncan* court held that a claim of cultural harm was analogous to a claim of destruction of Indian peoplehood. *Id.* at 139, 667 F.2d at 48. Such a claim was not covered even by the "broad rubrics" of the Indian Claims Commission Act. *Id.*, citing *Gila River Prime–Maricopa Indian Community v. United States, supra*, 190 Ct.Cl. at 801, 427 F.2d at 1200.

In their claims for breach of contract plaintiffs once more pray for consequential damages. It is well settled that damages which are too remote and consequential are not recoverable in a breach of contract action. *William Green Construction Co. v. United States*, 201 Ct.Cl. 616, 626–27, 477 F.2d 930, 936–37 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213

(1974). Remote and consequential damages are not recoverable in suits against the United States for recovery of common law damages. *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 877, 524 F.2d 707, 720 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).

In *Estate of Lillian G. Berg v. United States*, 231 Ct.Cl. 466, 687 F.2d 377 (1982) the Court of Claims, this court's predecessor court, followed the rule laid down in the famous case of *Hadley v. Baxendale*, 156 Eng.Rep. 145 (1854). Any damages which were not proximately caused by the breach or were not foreseeable to the breaching party at the time the contract was made are not recoverable consequential damages. *Estate of Lillian G. Berg v. United States*, *supra*, 231 Ct.Cl. at 476, 687 F.2d at 383. Thus, plaintiffs could not recover on their breach of contract claims for any damages which were not proximately caused by the Commission's "breach" or were not foreseeable to the Commission at the time it entered into the contract.

Any of plaintiffs' breach of contract claims for damages beyond the benefits levels established by the Act would certainly not be foreseeable. These dollar limits were maximums expressly created by Congress. In the contracts for relocation the Commission agreed to pay benefits that were within the limits established. Because the Commission was well aware of the maximum amount of benefits it had to pay out under the Act it is highly unlikely that any further liability was foreseeable to it when it entered into the contracts. "[A] person can only be held to be responsible for such consequences as may reasonably supposed to be in the contemplation of the parties at the time of making the contract." *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903).

 Plaintiffs claim that the Commission should have foreseen virtually all the problems they incurred that were in any way related to the relocation program. It is important to remember that foreseeability is determined at the time the contract is entered into. Plaintiffs allege that the Commission could have foreseen the poor workmanship and generally defective condition of new relocation homes. In this regard, it is of some significance that plaintiffs were among the first to relocate. It seems hard to believe that any meaningful knowledge concerning a general pattern of housing problems had been developed so early in the program. Any new home is bound to have some problems, but it cannot be said that the Commission could foresee all the troubles plaintiffs allege. Further, when inspections were made of Esther and Joe's mobile home in January 1981, over 1½ years after purchase, it was estimated that it would take $4,500 to repair all defects then existing. Inspection of Louise's relocation home in December 1980, over one year after purchase, indicated that an estimated $800 would be required to make necessary repairs to her house. It is not unreasonable to conclude that plaintiffs' housing claims are an insignificant part of the $1 million claimed by Esther and Joe and Louise. The significant part of their claims are the damages they attribute to social, cultural and psychological harms. Legal foreseeability in these areas has not been recognized in cases of this type.

Likewise, it would certainly be unfair to say the Commission could have foreseen the problems that would arise in connection with Louise using her home as collateral for her truck purchase. At the time the contract was entered into she did not own the truck. There was no indication in the submissions that the Commission would have any reason to suspect Louise would purchase a vehicle using her home as collateral. To charge the Commission with being able to foresee such behavior places an unfair and unrealistic burden on it.[25] The Commission was not an insurer that plaintiffs would prosper from the relocation, that they would not suffer harms because of the relocation, or that their homes

25. A lack of foreseeability is fatal to recovery of damages, *Estate of Lillian G. Berg v. United States*, 231 Ct.Cl. 466, 476, 687 F.2d 377, 383, and therefore the court need not engage in an extended analysis of proximate causation.

would not be subject to foreclosure for nonpayment of the mortgage, or that their homes would not be utilized as collateral. *See United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973).

Plaintiffs also seek what they claim are direct economic damages. In their briefs and at oral argument plaintiffs were most sketchy about their direct economic losses or damages. At oral argument, plaintiffs' counsel conceded that plaintiffs had received the full amounts of direct benefits they were entitled to under the Act when they were relocated. As to Esther and Joe, the settlement they reached with the Commission relative to their relocation housing problems, an accord and satisfaction, supports this concession. As to Louise Begay, any like concession by counsel is less clear. However, Louise sold her relocation home for more than she paid for it and thus any subsequent housing problems she had were divorced from the initial relocation home problems. However, counsel argued that plaintiffs were entitled to a host of out-of-pocket expenses they supposedly incurred as a result of the relocation program.[26] When asked, at oral argument, to identify these out-of-pocket expenses, plaintiffs' counsel cited the cost of motel rooms and transportation to and from Commission hearings relative to their relocation grievances, and the cost of medical expenses allegedly attributable to plaintiffs living in substandard housing as examples of these out-of-pocket costs. Counsel also asserted plaintiffs were entitled to damages to redress them for harm they suffered as the result of inadequate counseling, a matter discussed previously.

Plaintiffs' counsel was most eloquent and spirited in his attack on the relocation program itself and the Commission's initial difficulty in meeting the many challenges and problems inherent in the relocation undertaking given the monetary constraints imposed by Congress which, for example, initially limited the amount of counseling that could be done and the prices that could be paid for housing, repairs, etc. The court is in complete agreement that the relocation program was a drastic action. However, it was brought about because the two involved tribes could not, or would not, resolve their land dispute. In an effort to resolve this dispute as the "middle man", the government was forced to "take the heat". The decision to relocate was a political one made by Congress. The materials at hand indicate that Congress became aware of deficiencies in the program over time and responded to these deficiencies in the relocation program when they were called to its attention. For example, over time, housing benefit levels were raised and there have been increases in the number of services and workers associated with the program, thereby improving its counseling efforts and reducing housing problems.

Any program on a scale such as the one at hand was bound to have flaws from the outset. In the cases at hand, these "bugs" were coupled with the trauma inherent in forcing the Indians of both Tribes to relocate. As some of plaintiffs' own submissions indicate, a relocation program of any quality was essentially doomed from the outset in the eyes of the relocatees, because no matter what benefits and services were provided to the relocatees, they would not counteract the traumatic effect that was caused by the actual act of relocation itself. Forcing one to move from one's homeland and hogan, no matter how humble and devoid of indoor plumbing, cannot be made palatable to a relocatee by a new home. Any deficiencies in these new homes take on new dimensions for the relocatees for they provide them with the vehicle to continue to voice their displeasure with the fact they were relocated. This is not to ignore the fact of deficiencies but to weigh their true significance in the "hype" of the moment.

Plaintiffs' briefs and oral argument seem to suggest that all ills they suffered subsequent to relocation should be blamed on the

---

**26.** During oral argument plaintiffs' counsel only referred specifically to Joe and Esther relative to the "out-of-pocket" expenses suffered. However, it is assumed that Louise is also claiming entitlement to the same kind of out-of-pocket expenses.

relocation program itself. Yet a crucial distinction must be drawn between those damages allegedly suffered as a result of the actual working of the program and those damages allegedly suffered as a result of having to relocate. As plaintiffs' own materials would suggest, many of the harms plaintiffs complain of would appear to stem from the latter cause. As mentioned above, the decision to relocate was a political one made by Congress. This court does not see itself as the proper forum to attack such a decision. The complaints filed in these cases may well reflect valid criticisms of the government's relocation policies and procedures. However, these criticisms are better redressed through the political process. *See Gila River Indian Community v. United States, supra,* 190 Ct.Cl. at 801, 427 F.2d at 1200.

As mentioned before, there is simply no indication that Congress intended the government to be liable for these types of damages based on an alleged breach of the statute. Likewise Congress has not created a trust relationship in this situation which would subject the government to a cause of action for money damages. Finally, the instant action does not present a breach of contract situation. In any event, the court finds that plaintiffs' "inadequate counseling damages" are simply too speculative in nature. Attempting to quantify what is "enough" counseling, relative to damage considerations simply is not practical.

To say that the relocation program was the cause of all of plaintiffs' harms and problems which were encountered or experienced after relocation is an example of *post hoc ergo propter hoc* (after this therefor on account of this) reasoning. *"Post hoc ergo propter hoc* is neither good logic nor good law." *Volentine and Littleton v. United States,* 144 Ct.Cl. 723, 726, 169 F.Supp. 263, 265 (1959). *See also Loesch v. United States,* 227 Ct.Cl. 34, 45, 645 F.2d 905, 914 (1981), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981); *Baskett v. United States,* 8 Cl.Ct. 201, 210 (1985), *aff'd, without opinion,* 790 F.2d 93 (Fed.Cir.1986), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986).

For all of the reasons stated above, the court finds even if plaintiffs had been able to successfully state a cause of action in the instant case they would not be entitled to the type of damages, consequential and/or speculative and/or unforeseeable, they seek.

### f. Tort claims

One final issue must be disposed of. At the conclusion of its brief defendant argues that the *"claim* appears to sound in tort." D's brief at 32 (emphasis added). The court is not sure what defendant means by the term "claim." Apparently, given the content of the argument following defendant's assertion, it appears that defendant is saying that plaintiffs' *complaints* state causes of action for torts, or at least have tortious aspects to them. Of course, to the extent that any of plaintiffs' claims are based on alleged tortious conduct, they would be outside the scope of this court's jurisdiction. 28 U.S.C. § 1491(a)(1).

Plaintiffs' response to defendant's argument in this regard is premised on a phrase from *Eastport Steamship Corp. v. United States, supra,* 178 Ct.Cl. 599, 372 F.2d 1002 which is taken out of context. Plaintiffs assert that according to *Eastport Steamship Corp.* a claim is not tortious as long as it is "validated" by a statute, the Constitution or a contract. However, what the court in *Eastport Steamship Corp.* actually said was: "plaintiffs' *present claim*—if it is not validated by a statute, the constitution, or a contract (as we have already held in this opinion)—must be tortious." *Eastport Steamship Corp. v. United States, supra,* 178 Ct.Cl. at 614, 372 F.2d at 1013 (emphasis added). The court made this statement in declining to examine the full scope of Tucker Act jurisdiction which allows claims "for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Far from laying down a general rule, the statement simply pertained to the fact specific situation of the *Eastport Steamship Corp* case.

It is true that plaintiffs have attempted to stylize their claims so that they would

come within the jurisdiction of this court. Plaintiffs have not alleged any "pure" tort claims. However, there are definitely tortious components to plaintiffs' complaints. For instance, there are references in Esther and Joe's complaint relative to the death of their daughter Reba. Any claim brought for her alleged wrongful death would obviously be tortious. Indeed, Esther and Joe filed an unsuccessful administrative claim, based in part on Reba's death, under the Tort Claims Act, 28 U.S.C. § 2677. Likewise, any claims Esther and Joe themselves would have as a result of Reba's death, e.g., infliction of emotional distress would also sound in tort. All of the plaintiffs' claims for psychological distress are tortious in substance.

Plaintiffs also premise their claims, in part, on what they claim were some very questionable dealings between the Commission's real estate agents and Village Homes.[27] They have included in their appendix a copy of an FBI report in which an investigation was made into allegations that Village Homes supplied Commission employees with favors in exchange for their generating business. However, the report stated "this document contains, [no] * * * conclusions." Plaintiffs have offered nothing more to suggest the FBI uncovered any wrong doing. In any event had any wrong doing been uncovered it appears that such activities, insofar as plaintiffs are concerned, would give rise to possible claims of torts such as fraud or misrepresentation. Such claims also would be outside the jurisdiction of this court. 28 U.S.C. § 1491(a)(1); *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974).

Plaintiffs' appendix also contains an investigative report done by the Arizona Department of Real Estate on King, the real estate salesman, and a Navajo Indian, who sold Louise's relocation home. The report,

though not totally conclusive, does seem to indicate that King may have made misrepresentations in certain real estate transactions. However, nothing in this report concerns the sale of Louise's home. The investigation was concerned with other actions taken by King and his employees concerning other relocatees.

Even if the allegations against King pertained to Louise, such activities would be tortious. *Somali Development Bank v. United States, supra*, 205 Ct.Cl. at 749, 508 F.2d at 821. Furthermore, Louise's cause of action for any such misrepresentations would be against King, not the Commission. In this regard, the record indicates that at least one relocatee has instituted a civil suit against a third party relative to relocation activity.

 Finally, plaintiffs have asserted they were pressured into their relocation home choices because Sharp, their real estate counselor told them they would have to relocate soon or lose their benefits.[28] Assuming Sharp was guilty of false misrepresentation in this regard, the court would have no jurisdiction to decide claims based on this alleged tortious behavior. *See Somali Development Bank v. United States, supra.*

### IV.

#### *Conclusion*

For reasons discussed above, defendant's Motion to Dismiss and/or Motion for Summary Judgment is granted and plaintiff's Cross–Motion for Summary Judgment is denied. Accordingly, the clerk is directed to enter judgment dismissing plaintiffs' complaints in these two consolidated cases. No costs.

---

27. These allegations would be relevant only to any possible claim by Louise. Esther and Joe purchased their relocation home from another company (Leisure Homes).

28. There is a distinct probability that plaintiffs may have misunderstood or misinterpreted Sharp's statements to them. It is a fact that

some benefits (e.g. $5,000 bonus) would be reduced or lost if relocatees did not move within certain time periods prescribed by statute. *See* 25 U.S.C. § 640d–13(b)(1), (2), (3), (4) (1982). So, plaintiffs would, in fact, have lost some benefits if they delayed their relocation beyond certain dates.